2026 PA Super 179

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| TROY DAVID AMES | : | |
| Appellant | : | No. 1253 MDA 2025 |

Appeal from the PCRA Order Entered August 7, 2025
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005889-2019

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| TROY DAVID AMES | : | |
| Appellant | : | No. 1254 MDA 2025 |

Appeal from the PCRA Order Entered August 7, 2025
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005878-2019

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

OPINION BY BECK, J.:                    **FILED: AUGUST 10, 2026**

Troy David Ames ("Ames") appeals from the order entered by the York County Court of Common Pleas dismissing his petition pursuant to the Post Conviction Relief Act ("PCRA").[1] On appeal, Ames argues that the PCRA court erred in denying his claims that his trial counsel was ineffective for failing to

---

[1]  42 Pa.C.S. §§ 9541-9546.

challenge the introduction into evidence his prior no contest plea to crimes involving the assault of the victim in this case, his status as a parolee when he committed the crimes in this case, and his admission that he violated his parole by engaging in "assaultive behavior."  Because we conclude that the PCRA court erred in declining to find trial counsel ineffective for failing to file a motion to suppress Ames' admission that he violated his parole by engaging in the conduct giving rise to the underlying criminal charges in this matter, we reverse the order denying his PCRA petition and remand for a new trial.

Ames and the victim, L.A., married in June 2015 and have one son together.  In September 2015, Ames punched L.A., stabbed her with a pencil, and threatened her with further physical harm.  As a result of this incident, in February 2016, Ames pled no contest to terroristic threats and simple assault, for which he received a sentence of eleven-and-a-half to twenty-three months in prison.

While on parole from that sentence, the events leading to the charges underlying this case occurred.  On two separate occasions, in October and November 2018, Ames allegedly strangled, severely beat, threatened to kill, and sexually assaulted L.A.  In December 2018, L.A. ended her relationship with Ames and in March 2019, she reported the two incidents to Ames' parole officer.  Ames was subsequently charged with strangulation, simple assault, terroristic threats, intimidation of witnesses, sexual assault, and aggravated assault.

At Ames' trial, the Commonwealth introduced evidence of Ames' 2016 no contest plea and his status as a parolee at the time the events in this case occurred. Additionally, Ames' parole officer, David Woodring, testified as a witness for the Commonwealth. Agent Woodring stated that before police filed the charges in this case, he had Ames report to his office where he took Ames into custody on suspicion that he violated his parole by engaging assaultive behavior and violating a no-contact order relating to L.A. Agent Woodring testified that he provided Ames with a description of L.A.'s allegations against him. He also told Ames that he could either have a hearing to determine whether he had violated his parole or he could waive his right to the hearing by admitting he violated his parole. Ultimately, Ames signed a form admitting that he violated his parole by engaging in assaultive behavior and violating a no-contact order.

The jury convicted Ames of all charges. On September 14, 2021, the trial court sentenced him to an aggregate term of forty-and-a-half to eighty years in prison. On December 19, 2022, this Court affirmed Ames' judgment of sentence. ***See id.*** On June 20, 2023, our Supreme Court denied his petition for allowance of appeal.

On June 20, 2024, Ames filed the instant PCRA petition in which he raised several claims of ineffective assistance of trial counsel. On May 23, 2025, the PCRA court held a hearing on Ames' petition and on August 7, 2025, the PCRA court denied relief.

- 3 -

Ames timely appealed to this Court. He presents the following issues for review:

I.    Whether the [PCRA court] erred in not finding trial counsel ineffective in not raising a proper objection and permitting into evidence [Ames'] prior [2016] conviction … and permitting/conceding the admissibility that [Ames] was on parole at the time of allegedly committing the instant offenses?

II.   Whether the [PCRA court] erred in not finding that trial counsel was ineffective in failing to file a pre-trial motion to suppress and/or object to [Ames'] statements to his parole agent and Commonwealth's Exhibit 23[,] which contained admissions by [Ames] when they were given when [he] was in custody by state parole and was questioned about the instant offenses without being advised of his **_Miranda_** warnings?

III.  Whether the [PCRA court] erred in not finding trial counsel ineffective in failing to object at trial to statements made by [Ames] to his parole agent and Commonwealth's Exhibit 23?

Ames' Brief at 4 (unnecessary capitalization and typographical errors omitted).

We begin by acknowledging our standard of review. "We review the denial of PCRA relief by examining whether the PCRA court's conclusions are supported by the record and free from legal error." **_Commonwealth v. Johnson_**, 289 A.3d 959, 979 (Pa. 2023). "[W]e defer to the factual findings of the post-conviction court, which is tasked with hearing the evidence and assessing credibility." **_Id._** Our standard of review of a PCRA court's legal conclusions, however, is de novo. **_Id._**

In his first issue, Ames argues that the PCRA court erred in dismissing his claim that trial counsel was ineffective for conceding the admission of his 2016 no contest plea to assaulting L.A. and his status as a parolee at the time L.A. reported his crimes in the instant matter. *See* Ames' Brief at 11-16. He contends that the admission of this evidence violated Pennsylvania Rule of Evidence 404(b) and asserts that the prejudicial effect of the evidence outweighed its probative value. *Id.* at 14. Ames argues that the Commonwealth sought to introduce the evidence solely for propensity purposes, which is impermissible under Rule 404(b). *Id.* at 15. He further asserts that his trial counsel lacked any reasonable basis for allowing the introduction of the evidence. *Id.* Although trial counsel sought to use the evidence that Ames was on parole at the time L.A. reported him in this case to demonstrate that she was trying to falsely accuse him of violating his parole, he maintains the introduction of the evidence only served to establish propensity and his bad character, precluding the jury from weighing all the evidence impartially. *Id.* at 15-16.

With respect to ineffective assistance of counsel claims, our Supreme Court has stated:

> It is well[]settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a

- 5 -

reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

***Commonwealth v. Reid***, 259 A.3d 395, 405 (Pa. 2021) (quotation marks and citation omitted). A PCRA petitioner must address each of these three prongs on appeal, as the petitioner bears the burden of pleading and proving that counsel provided ineffective assistance. ***Id.*** This Court, however, need not review claims of ineffective assistance of counsel in any particular order, as the law is clear that "[a] petitioner's failure to satisfy any prong of this test is fatal to the claim." ***Id.***

Under Rule 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). Thus, under Rule 404(b), evidence of prior bad acts "is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes," but "may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015) (en banc) (citations omitted). Evidence may be admitted under Rule 404(b)(2) only "if the probative value

of the evidence outweighs its potential for unfair prejudice." *Id.* at 360 (citation omitted).

The record reflects that in February 2016, Ames pled no contest to charges of terroristic threats and simple assault arising out of his abuse of L.A. in September 2015. Commonwealth's Motion in Limine, 8/27/2020, ¶¶ 10-12. Ames received a sentence of eleven-and-a-half to twenty-three months of incarceration, followed by three years of probation. *Id.* ¶ 13. In the instant matter, the Commonwealth filed a motion to present evidence of Ames' 2016 no contest plea and status as a parolee at the time he committed the crimes in this case. *See id.* ¶¶ 1-42. Although this constituted evidence of other crimes or wrongs under Rule 404(b)(1), the Commonwealth sought admission under the common plan or scheme and motive exceptions of Rule 404(b)(2), arguing that the evidence would show that Ames used harassment, intimidation, and physical violence to preserve his intimate relationship with L.A. *Id.* ¶¶ 19-34. The Commonwealth also sought admission of this evidence under the res gestae exception to Rule 404(b)(1). *Id.* ¶¶ 35-42. Trial counsel did not contest the admission of this evidence, and the trial court granted the Commonwealth's motion. *See* Trial Court Order, 9/10/2020; *see also* N.T., 5/23/2025, at 9-10.

At the hearing on Ames' PCRA petition, trial counsel explained her decision not to challenge the introduction of his prior no contest plea to assaulting L.A. and his status as a parolee when he committed the crimes in

this case. *See* N.T., 5/23/2025, at 9. Specifically, trial counsel testified that "a large part of our defense was the fact that there was a prior incident and during the time that [Ames] was on parole, [L.A.] continually threatened him and talked about calling his parole officer[.]" *Id.* Thus, trial counsel explained that her defense strategy was to show that these prior incidents occurred and that L.A. reporting Ames to his parole officer "could have been false statements by her to get him in trouble because he wanted to, you know, end the relationship, things like that. So we incorporated that into our defense and we discussed that a lot." *Id.* at 9-10. Trial counsel further testified that "I thought there was a very slim -- there would be no chance that the Judge was going to keep that prior conviction out, because it was so similar to the offenses, the same victim, the same type of offense, so we just used it as part of our defense." *Id.* at 10.

"Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Hunter*, 355 A.3d 394, 414 (Pa. Super. 2026) (citation omitted). To establish that counsel's chosen trial strategy lacked a reasonable basis, a petitioner must establish that "no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success." *Commonwealth v. King*, 259 A.3d 511, 520 (Pa. Super. 2021) (citation and quotation marks omitted). "We do not employ

a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken." *Id.* (citation and quotation marks omitted).

Here, Ames has offered no argument that a different strategy would have offered a greater potential chance of success, let alone a significant one. Instead, in his appellate brief, Ames makes conclusory statements that the jury only could have considered the evidence at issue for propensity purposes, showing that he was a person of bad character, and that the prejudicial effect of the evidence outweighed its probative value, without citing any caselaw or identifying anything in the record to support his claim. *See* Ames' Brief at 14-16. As Ames has failed to establish that trial counsel's strategy lacked a reasonable basis, the second prong for the test of ineffectiveness, we conclude that the PCRA court did err in denying this claim.

In his second and third issues, Ames argues that PCRA court erred in finding trial counsel was not ineffective for failing to file a pretrial motion to suppress statements he made to Agent Woodring when he was in custody regarding violating his parole and the signed form in which Ames admitted that he violated his parole for, inter alia, "assaultive behavior." *See* Ames' Brief at 16-23. He asserts that the statements he made were tantamount to a confession to the crimes in this case, that Agent Woodring's interaction with him constituted a custodial interrogation, and that he never received

*Miranda*[2] warnings. *Id.* Ames contends that this was a violation of his constitutional rights, and based on discrepancies in L.A.'s testimony and the testimony of multiple medical experts that contradicted her claims, the unconstitutional admission of his confession was plainly prejudicial and affected the outcome at trial. *Id.* at 21-23.

The Fifth Amendment provides that "no person … shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This protection not only permits an individual to refuse to testify against himself when he is a criminal defendant, "but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Commonwealth v. Cooley*, 118 A.3d 370, 375 (Pa. 2015) (quotation marks and citations omitted). "The Fifth Amendment privilege against self-incrimination is generally not self-executing, and ordinarily an individual must assert the privilege for subsequent statements to be considered 'compelled' within the meaning of the Fifth Amendment." *Id.* The Fifth Amendment, however, "is self-executing where an individual is subject to custodial interrogation without being given *Miranda* warnings." *Id.*

"It is well[]settled that when a defendant is subject to a custodial interrogation, the Fifth Amendment requires that law enforcement officers

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

provide a defendant with his **Miranda** warnings." **Commonwealth v. Seeney**, 316 A.3d 645, 649 (Pa. Super. 2024). Our Supreme Court has explained that under such circumstances, "before law enforcement officers question an individual" the officers "must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed." **Commonwealth v. Yandamuri**, 159 A.3d 503, 520-21 (Pa. 2017) (citing **Miranda**, 384 U.S. at 478-79).

"The standard for determining whether an encounter with the police is deemed 'custodial' or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated" and "does not depend upon the subjective intent of the law enforcement officer interrogator." **Seeney**, 316 A.3d at 649 (quotation marks and citations omitted). A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." **Id.** (cleaned up). Specifically, an "interrogation" occurs if there is police conduct that is "calculated to, expected to, or likely to evoke admission." **Id.** (quotation marks and citation omitted). Put another way, it is an interrogation if "the police should know that their words or actions are reasonably likely to elicit

- 11 -

an incriminating response from the suspect." ***Interest of N.M.***, 222 A.3d 759, 770 (Pa. Super. 2019) (citation omitted). Further, "under certain circumstances, individuals who are not law enforcement personnel nevertheless possess the status of law enforcement for purposes of custodial interrogation." ***In re C.O.***, 84 A.3d 726, 732 (Pa. Super. 2014) (quotation marks, citation, and brackets omitted).

"We must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation." ***N.M.***, 222 A.3d at 771 (citation omitted). "Volunteered or spontaneous utterances by an individual are admissible even without ***Miranda*** warnings." ***Id.*** (citation omitted).

Ames relies on ***Commonwealth v. Cooley*** in support of his claim that he was subjected to a custodial interrogation by Agent Woodring. In that case, Cooley was on parole for a drug conviction when his parole agent received a voicemail from the father of Cooley's fiancée claiming that Cooley possessed firearms and may have been selling drugs from his home. ***Cooley***, 118 A.3d at 371-72. Cooley met with his parole officer, who handcuffed him and searched him for weapons, finding none. ***Id.*** at 372. Cooley's parole officer told him that he and other parole officers were going to search his home for firearms and drugs and asked him if they would find firearms in his home; Cooley admitted they would. ***Id.*** Four parole officers transported Cooley to his home, in handcuffs, and conducted a search during which they found a

firearm, marijuana, and cash. *Id.* During the entirety of this interaction, Cooley never received **Miranda** warnings. *Id.*

The Commonwealth charged Cooley with multiple firearms and drug offenses. *Id.* He filed a motion to suppress his statements to the parole agents, which the trial court denied, and a jury convicted him on all counts. *Id.* On appeal, Cooley challenged the denial of his suppression motion on the basis that he did not receive **Miranda** warnings. *Id.* at 373. This Court affirmed, concluding that **Miranda** warnings were not necessary during questioning by the parole officers because Cooley's statements were made during a parole interview rather than a custodial interrogation. *Id.*

Our Supreme Court granted further review "to determine whether there was custodial interrogation, such that the failure to issue **Miranda** warnings violated [Cooley]'s Fifth Amendment rights, requiring suppression of statements made." *Id.* (quotation marks, citation, and brackets omitted). The Court determined that Cooley was in custody, as he was handcuffed, the parole agents never informed him that he was not under arrest, and they then questioned him about new crimes. *Id.* at 379. The Court explained that "the parole agents stated [Cooley] was being investigated for new crimes; their interrogation and search was unquestionably aimed at crimes for which he was not on parole. At that point, the parole agents' conduct was the functional equivalent of that of police officers." *Id.* Our Supreme Court therefore concluded that "a reasonable parolee would not feel free to terminate the

encounter and leave the parole office[,]" that Cooley had been subject to a custodial interrogation, "and because the privilege was self-executing, the parole agents' failure to administer *Miranda* warnings violated [his] Fifth Amendment rights." *Id.*

In the present case, Agent Woodring testified at trial that after L.A. reported Ames' assault and he received her consent to proceed with criminal charges in late March 2019, he contacted the Lower Windsor Police Department and provided her statement to police. N.T., 4/19-23/2021, at 348. Agent Woodring explained that he decided to proceed with a parole violation because the police department had not yet filed charges, so he instructed Ames to report to his office on April 1, 2019, where he took Ames into custody for violating his parole. *Id.* Agent Woodring stated that immediately upon Ames' arrival, he placed him in handcuffs and shackles and took him to an interview room. *Id.* at 357-58. Agent Woodring explained that he then went through the "notice of charges" verbatim with Ames, which detailed L.A.'s new claims of assault. *Id.* at 356-57. He further reviewed the "notice of rights" form, which informed Ames that he had the right to have a hearing on his alleged parole violation and have an attorney represent him at that hearing; or, if he preferred, he could waive his right to a hearing and admit to the parole violations. *Id.* at 349-50 & Commonwealth's Ex. 23. The notice of charges form stated that L.A. accused Ames of threatening her with a butcher's knife and punching repeatedly, putting his hands around her

throat, and threatening to kill her and bury her in a field. N.T., 4/19-23/2021, at 351 & Commonwealth's Ex. 23. Ames opted to sign the form admitting to violating his parole for assaultive behavior and violating the no-contact order, and the Commonwealth introduced this admission at trial. N.T., 4/19-23/2021, at 350-57 & Commonwealth's Ex. 23.

Upon his arrival at Agent Woodring's office, Ames was plainly in custody. *See* N.T., 4/19-23/2021, at 48. The Commonwealth does not contest this point. *See* Commonwealth's Brief at 18. We must therefore determine whether Agent Woodring conducted an interrogation of Ames such that the failure to provide *Miranda* warnings to Ames violated his Fifth Amendment rights.

The record reveals that after L.A. reported Ames' abuse to Agent Woodring, the first thing he did was provide that information to the local police department so that law enforcement could pursue new criminal charges against Ames. *See* N.T., 4/19-23/2021, at 348. When the police did not immediately act, Agent Woodring took Ames into custody for violating his parole based upon the new criminal conduct alleged. *See id.* While in custody, Agent Woodring went through L.A.'s allegations against Ames with him in detail and presented him with the option of having a hearing to determine whether he violated his parole or signing a form waiving his right to the hearing and admitting that he violated his parole by engaging in the criminal conduct L.A. alleged. *See id.* at 349-57. Ames chose to sign the

- 15 -

form admitting to the parole violations. *See id.* At no time did Agent Woodring inform Ames of his *Miranda* rights, including, in particular, that anything he said or did could be used against him in court. *See id.* Ames' signed the admission that was subsequently used against him at trial. *See id.* & Commonwealth's Ex. 23.

Both the trial court and the Commonwealth maintain that Ames' admission was entirely voluntary, as there is nothing in the record to suggest that Agent Woodring questioned Ames's about L.A.'s allegations of abuse. *See* Trial Court Opinion, 8/7/2025, at 3; Commonwealth's Brief at 17-18. Both the trial court and the Commonwealth further assert that Agent Woodring's interaction with Ames was a regular and routine part of the parole administrative process. *See* Trial Court Opinion, 8/7/2025, at 3; Commonwealth's Brief at 17-18.

Addressing the second point first, it is true that a parole officer may ask general administrative, biographical, or geographical questions of a parolee and "information obtained via routine questions designed to secure biographical data necessary to complete booking or pre-trial services is exempt from *Miranda*'s coverage." *Commonwealth v. Daniels*, 644 A.2d 1175, 1181 (Pa. 1994). This is not, however, what occurred in this case. Instead, Agent Woodring brought Ames in to ferret out whether Ames engaged in the criminal conduct alleged by L.A., which would constitute a violation of his parole. He detailed L.A.'s serious allegations of new criminal conduct

against Ames, informed him that he believed Ames had violated his parole by, inter alia, engaging in assaultive behavior, and then gave him the option to either have a hearing or admit that he did, in fact, engage in assaultive behavior. Critically, **Cooley** draws an important distinction between a routine parole interview and a parole officer accusing a parolee "of crimes for which he was not on parole" and informing the parolee "that he was being investigated for new crimes[.]" **Cooley**, 118 A.3d at 378-79. The latter circumstances constitute an interrogation and Agent Woodring's "conduct was the functional equivalent of that of police officers." **Id.** at 379.

Turning to the first point, while the trial court and Commonwealth are also correct that Agent Woodring did not question Ames to elicit his admission, a finding that an individual was entitled to **Miranda** warnings is not limited to circumstances where the defendant responded to questioning. Here, the parole officer's "words [and] actions" gave Ames the specific opportunity to incriminate himself and thus were "reasonably likely to elicit an incriminating response." **See N.M.**, 222 A.3d at 770. Ames did not spontaneously admit to violating his parole; Agent Woodring placed a form in front of him giving him the option to admit the alleged parole violations, which simultaneously constituted new criminal conduct. **See** N.T., 4/19-23/2021, at 349-57; Commonwealth's Exhibit 23.

Based on the totality of the circumstances, we conclude that Ames was subject to a custodial interrogation. Because the privilege against self-

incrimination was self-executing in this scenario, Agent Woodring's failure to administer **Miranda** warnings violated Ames' Fifth Amendment rights. Therefore, there is merit to Ames' contention that trial counsel should have filed a motion to suppress Ames' statements to Agent Woodring and Commonwealth's Exhibit 23.

We turn now to whether trial counsel had a reasonable strategic basis for not seeking suppression. As stated above, trial counsel testified at the PCRA hearing that her strategy was to try to demonstrate that L.A. had falsely accused Ames of assault so that he would get into trouble for violating his parole. **See** N.T., 5/23/2025, at 9-10. The crux of this defense theory was that L.A.'s allegations were false. By signing an admission that he violated his parole by engaging in assaultive behavior, Ames conceded that L.A.'s allegations were true.

Allowing the introduction of this evidence thus directly contradicted trial counsel's stated strategy. **See Hunter**, 355 A.3d at 414. Indeed, "no competent counsel would have chosen" to allow evidence of his admission to the crimes in question while pursuing a defense that the victim invented the allegations. **See King**, 259 A.3d at 520. We therefore conclude that trial counsel's failure to seek suppression was not part of a reasonable trial strategy designed to effectuate Ames' interests.

Regarding prejudice, we begin by emphasizing, as the United States Supreme Court has recognized:

> A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him …. The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (cleaned up); *see also Commonwealth v. Ardestani*, 736 A.2d 552, 557 (Pa. 1999) (Opinion Announcing the Judgment of the Court) (same). Notably, Ames' admissions, standing alone, were sufficient to convict him of several of the criminal charges against him.

Additionally, as Ames observes, there was a significant amount of expert medical testimony presented at trial that supported his defense and contradicted L.A.'s allegations against him. *See* Ames' Brief at 21-22. For example, Dr. Kathleen Brown, who testified as an expert for the defense in the field of forensic nursing and sexual assault examinations, reviewed photographs of L.A.'s injuries, her medical records, and reports related to L.A.'s allegations against Ames, and concluded that L.A. injuries were not consistent with the violent acts she claimed Ames committed against her. N.T., 4/19-23/2021, at 443-54. Similarly, Dr. Kathleen Struminger, the physician at MedExpress who treated L.A. for injuries she claimed were caused by Ames, testified for the defense that on the date of her examination, L.A. stated the injuries were caused by storage containers falling on her. *Id.* at 398. Dr. Struminger further testified that she is a mandated reporter,

meaning that she must report any cases to law enforcement that she suspects are the result of abuse, and that nothing about L.A.'s injuries compelled her to report L.A.'s injuries to the police. *Id.* at 402.

For its part, in addition to L.A.'s testimony, the Commonwealth presented testimony from L.A.'s mother and co-worker, who observed L.A.'s injuries, and Emily Huggins, RN, who testified that L.A.'s injuries were consistent strangulation. *See* N.T., 4/19-23/2021, at 277-80, 282-89, 300-12. The Commonwealth did not present any expert testimony or other evidence to contradict Dr. Struminger's testimony, i.e., a medical professional that examined L.A. and found her injuries consistent with her claims of abuse against Ames. *See id.*

Given the conflicting evidence before the jury at trial, we conclude that Ames' confession to assaulting L.A. likely had a substantial impact on the jury determination as to the credibility and weight of the evidence presented. Thus, there is a reasonable probability that, but for trial counsel's failure to seek suppression of his unlawfully obtained confession and admissions to his parole officer, the result of the trial may have been different. Ames was therefore prejudiced by trial counsel's inaction.

On this basis, the PCRA court erred by denying his claim that trial counsel provided ineffective assistance by failing to pursue a suppression motion. We therefore reverse the order denying Ames' PCRA petition and remand this matter to the trial court for a new trial consistent this decision.

Order reversed. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/10/2026